IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| In re: <br><br>UAL CORPORATION, et al., <br><br>Debtors. <br><br><br>HSBC BANK USA, <br><br>Plaintiff, <br>v. <br><br>UAL CORPORATION, et al., <br><br>Defendants. | Chapter 11 <br><br>Case No. 02-B-48191 <br><br><br><br><br>Adv. Proc. No. 04-02413 |

### MEMORANDUM OF DECISION

This adversary proceeding is before the court for entry of judgment after trial. The adversary was brought by HSBC Bank USA ("HSBC") to determine the nature, extent, and value of its interests in a lease held by United Air Lines, Inc. ("United") at San Francisco Airport ("SFO"). HSBC is the indenture trustee for bondholders with a substantial claim against United. The parties have stipulated that this bond claim is secured by a portion of United's leased real estate at SFO, and the issue at trial was the value of that portion of the lease— HSBC's collateral. HSBC's bond claim exceeds the value of the collateral, and so, pursuant to 11 U.S.C. § 506(a), the claim is bifurcated into a secured claim to the extent of the value of the collateral and an unsecured claim for the balance. The parties dispute the value of the collateral.

The collateral—particular leased real estate—is a unique asset. Because no market exists for this precise asset, comparison to similar property provides the best measure of value. As discussed below, the appropriate comparison is to airport property of the same type in the same location as the collateral, rather than to facilities in distant locations that could be used for the debtor's intended purpose. Under this valuation method, HSBC's secured claim has a value of $27,247,632.

## Jurisdiction

Title 28 U.S.C. § 1334(a) grants district courts exclusive jurisdiction over bankruptcy cases, but 28 U.S.C. § 157(a) allows these cases to be referred to bankruptcy court. Under Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has made such a reference of all of its bankruptcy cases. When presiding over a referred case, the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(1) to enter appropriate orders and judgments in core proceedings within the case. The pending adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate) and (K) (proceedings to determine the extent of the validity, extent, or priority of liens). This court may therefore enter a final judgment.

## Background

HSBC is the Indenture Trustee for bonds issued by the California Statewide Communities Development Authority ("CSCDA") in the principal amount of $154,845,000. The proceeds from the bonds financed projects for United at SFO. CSCDA sought to ensure payment of these bonds by entering into a sublease-leaseback transaction with United. In this transaction, United first subleased to CSCDA one portion of a large leasehold at SFO called the Maintenance Operations Center (the "MOC"). The sublease extended through 2033 even though at the time of the transaction, United's MOC lease extended only through 2003, with

2

an option to renew through 2013. The sublease addressed this anomaly by providing that if the MOC lease terminated before 2033, the sublease would terminate as well.

As the second part of the sublease-leaseback transaction, CSCDA leased the subject property back to United, with leaseback rent equal to the debt service on the bonds. The leaseback also extended through 2033 or until the bonds were paid off (with a cap at 2038). If the MOC lease terminated before 2033—or if for any reason United lost the ability to use the property—the leaseback still obligated United to pay "rent" until the bonds were paid off. As part of the transaction, CSCDA assigned its rights to enforce the sublease to the Indenture Trustee for the bondholders, currently HSBC.

After its bankruptcy filing, United stopped paying the rent required under the leaseback from CSCDA, thus breaching the leaseback and causing a default in the bond payments.

In the course of United's bankruptcy, this court determined that the sublease-leaseback transaction was not a set of "true leases" under § 365 of the Bankruptcy Code but rather a secured financing arrangement—effectively a leasehold mortgage. The effect of the transaction was that a failure by United to make the required bond payments would give HSBC the right to take possession of the "subleased" property and lease that property to another party. Thus, the court found, the portion of United's MOC lease that was subleased to CSCDA was actually collateral securing United's obligation to pay the bonds issued by CSCDA. *United Air Lines, Inc. v. HSBC Bank USA*, 307 B.R. 618 (Bankr. N.D. Ill. 2004). On appeal, the Seventh Circuit affirmed the determination that the sublease-leaseback transaction was security for United's obligation to pay the CSCDA bonds. *United Air Lines, Inc. v. HSBC Bank USA*, 416 F.3d 609, 617-18 (7th Cir. 2005), *cert. denied*, ___U.S.___, 126 S.Ct. 1465 (2006).

While the appeal to the Seventh Circuit was pending, HSBC commenced this adversary proceeding to determine the nature, extent, and value of CSCDA's interest in the sub-

3

leased property, assigned to HSBC as trustee. After the Seventh Circuit's decision, the parties stipulated that HSBC holds a perfected security interest in the subleased property. Stip., ¶ 1, Docket Item No. 18.

As of the petition date, United had exercised its option to extend the MOC lease through June 30, 2013. After the petition date, but before entering the Stipulation, United obtained a further option to renew the MOC lease for an additional ten years, to 2023.

United's confirmed plan of reorganization provides that HSBC has a "Class 2B-2 Other Secured Claim" to the extent of the value of the collateral and a "Class 2E-6 Other Unsecured Claim" for any remaining claim. First Am. Discl. Stat., No. 02-B-48191, Docket Item No. 13,279, at 83. Under the plan, United has the option of paying the collateral value of the secured claim in cash. The remainder of HSBC's claim is entitled to a pro rata share of the unsecured distribution, estimated to pay 4 to 8% of the claims. Second Am. Ch. 11 Plan, No. 02-B-48191, Docket Item No. 14,813, at 52, 57.

The collateral defined by the sublease is United's leasehold interest in 20.75 acres of the MOC. This property is improved with a large hangar, an office/storage building with five floors and a mezzanine, and paved surface areas useful for parking aircraft.

Also located at SFO—in an area separate from United's MOC—is a similar hangar facility called Superbay, which is leased to both American Airlines and United. Superbay is situated on 45.31 acres, and so, compared to the collateral, has roughly twice the area of open pavement.

4

## Discussion

*The valuation standard.* Section 506(a) of the Bankruptcy Code governs the allowance and valuation of secured claims. It provides in part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property. . . . Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property. . . .

11 U.S.C. § 506(a).

In *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997), the Supreme Court interpreted this valuation standard, holding that where, as here, the debtor proposes to retain collateral under a plan, the value of the collateral is what the debtor would have to pay to replace it—"the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id.* at 960.

In applying this standard to HSBC's collateral a question arises as to what is "like property." *Rash* itself dealt with fungible property—a motor vehicle of a particular model actively traded in used-vehicle markets. With this sort of fungibility, valuing "like property" is a relatively straightforward fact-finding endeavor, complicated only by concerns about whether the market value ought to be retail or wholesale, and if retail, whether deductions of the retailer's value-added services are appropriate. *Id.* at 965, n.6; *In re Gonzalez*, 295 B.R. 584, 590-91 (Bankr. N.D. Ill. 2003) (discussing deductions from retail replacement cost). When collateral is not fungible, there is no readily accessible market price, and the value of "like property" can only be measured by comparison to transactions involving similar properties, with adjustments for whatever relevant differences exist between the collateral and its comparables. *See, e.g., In re Abruzzo*, 249 B.R. 78, 85-87 (Bankr. E.D. Penn. 2000) (employing comparisons of similar properties to value unique real estate).

5

The parties here agree that comparable properties should be used to value HSBC's collateral, but they disagree about which properties are comparable. HSBC suggests that Superbay is the most comparable property, and indeed, Superbay is a similar facility in the same location. United, in contrast, argues that location is irrelevant because the scheduled maintenance tasks that it proposes to perform using the collateral could be performed anywhere in the world. It proposes hangar space at airports in Portland, Oregon, and Dallas/Fort Worth as more appropriate comparables. United essentially argues that any value attributable to the collateral's location at SFO is irrelevant because United does not need to take advantage of that location.

Location, however, is not irrelevant: it is an essential attribute of real estate; a real estate comparable—"like property"—should provide all of the location advantages of the subject property. And if the location of HSBC's collateral provides value that United does not need, that value must nevertheless be considered in assessing what the collateral is worth. Indeed, United's position—that "like property" is the least expensive substitute able to meet the debtor's needs—produces absurdity. Consider, for example, a creditor secured by a semi-trailer rig, which the debtor proposes to use only to transport his children to school. United's argument would measure the value of the creditor's interest in the semi-trailer by comparison to the cheapest motor vehicle that could adequately transport the children—a compact car perhaps. This is not the holding of *Rash*. To the contrary, *Rash* suggests that "like property" should be as much like the collateral as possible. Thus, the court specified that if the retail price of a fungible item is used, then there should be a deduction for items of value—warranties and reconditioning for example—added by the retailer that made it different from the collateral. 520 U.S. at 965, n.6.

To support its contrary position, United points to statements in *Rash* that the value of retained property is "the cost the debtor would incur to obtain a like asset for the same 'pro-

posed . . . use,'" *id.* at 965, and that this cost is what "a willing buyer in the debtor's trade, business, or situation would pay," *id.* at 960. These statements, however, are simply reflections of the Court's decision that valuation under § 506(a) for retained collateral must be based on the price that the debtor would have to pay to replace it.

*Rash* presented the court with a choice between a replacement value (urged by the creditor) and a lower, liquidation/foreclosure value (urged by the debtor). In choosing between these interpretations, the Court focused on the language of § 506(a) requiring that value be determined "in light of . . . the proposed disposition or use" of the collateral:

> As we comprehend § 506(a), the "proposed disposition or use" of the collateral is of paramount importance to the valuation question. [T]he debtor has two options for handling allowed secured claims: surrender the collateral to the creditor . . . or, under the cram down option, keep the collateral over the creditor's objection and provide the creditor. . . with the equivalent of the present value of the collateral. . . . The "disposition or use" of the collateral thus turns on the alternative the debtor chooses—in one case the collateral will be surrendered to the creditor, and in the other, the collateral will be retained and used by the debtor. Applying a foreclosure-value standard when the cram down option is invoked attributes no significance to the different consequences of the debtor's choice to surrender the property or retain it. A replacement-value standard, on the other hand, distinguishes retention from surrender and renders meaningful the key words "disposition or use."

*Id.* at 962.[1] Thus, when the Court spoke of valuing collateral according to the debtor's "proposed . . . use," it was distinguishing between retention and surrender, not requiring valuation based on a proposed suboptimal use.

Similarly, in employing replacement value, the Court recognized that different debtors might be able to procure a "like property" replacement in different markets, at different prices. An automobile of a given make and model, for example, might be available for purchase through a retail dealer, a wholesale auction, or a private transaction. The Court read

---

[1] *Rash* addressed the interpretation of § 506(a) in the context of retained collateral in Chapter 13, and the language omitted from this quotation deals with provisions of that chapter. However, the parties do not dispute that the reasoning of the decision is applicable in the analogous context of Chapter 11.

7

§ 506(a) as imposing no universal rule for choosing the applicable market. Rather, the Court held: "Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property." *Id.* at 965, n.6. Consistent with this reading, the Court's reference to what "a willing buyer in the debtor's trade, business, or situation would pay" relates to the market available to that particular debtor. An ordinary consumer (a buyer "in the debtor's . . . situation") might not have access to the wholesale market for automobiles, but a debtor in the business of selling automobiles would. *See Gonzalez*, 295 B.R. at 590-91 (replacement value depends on the debtor's position in the marketplace).

This case does not involve fungible goods available for sale in more than one market. Valuation depends simply on what United (or any other user of the collateral) would have to pay for a similar lease of property like the collateral.[2] Superbay provides the best indication of that value. The facilities at Superbay and the collateral are similar, as experts for both parties acknowledged. Trial Tr. at 75:19-20, 364:1-7; HSBC Ex. 1, at 24. In addition, parties of similar sophistication renegotiated the terms of the Superbay lease in 2004. HSBC Ex. 120. Most important, Superbay shares the advantages of location at SFO. Thus, the evidence at trial established that Superbay is the best comparable for the collateral.

*Annual rent commanded by the collateral.* Four types of leased property are included in the collateral to be valued here: paved area, hangar space, office space, and storage. The

---

[2]The question raised here has also arisen in the context of rural land. In *In re Donato*, 253 B.R. 151, (M.D. Pa. 2000), a creditor was secured by fourteen acres of land in a developing area that the debtor intended to use as a hobby farm. As a single parcel, the land was worth $186,000; subdivided, it was worth $926,000. The court valued the property according to the lower-value use. This outcome allowed a debtor to cram down a plan that paid the secured creditor significantly less than what the debtor would have had to pay for the property on the open market. *In re Bell*, 304 B.R. 878 (Bankr. N.D. Ind. 2003), dealt with a similar situation and, applying a more appropriate reading of *Rash*, required that the land in question be valued according to the price it would command in the market—its optimal use—rather than according to its price as farmland.

parties have agreed on the rental cost of the storage space ($5/sq. ft. annually); the remaining elements of cost can be determined by reference either to the Superbay lease or United's MOC lease.

*(1) Paved area.* The cost of the paved area of the collateral can be determined by reference to the MOC lease. Under that lease, United pays $1.50/sq. ft. annually for all of its leased real estate. This rent was negotiated without including the value of any buildings, structures, or improvements on the land. United Air Lines Maintenance Base Lease, HSBC Ex. 4, at 10, 11. As noted above, United and SFO recently agreed that United could renew the lease on the same terms. Thus, $1.50/sq. ft. annually is the proper cost for the paved area of the collateral.

*(2) Hangar space.* The cost of the hangar space of the collateral can be determined by reference to the Superbay lease. That lease is for real estate with a total area of 1,973,704 sq. ft., of which 255,800 sq. ft. is hangar space and 1,717,904 sq. ft. is open pavement. The annual rent for Superbay is $5,118,558, with no division between hangar space and paved area. However, since the rent for the paved area, as discussed above, can be fixed at $1.50/sq. ft., or $2,576,856 annually, the annual rent attributable to the hangar space can be fixed at $2,541,702 (total rent of $5,118,558 less the $2,576,856 attributable to the paved area). The 255,800 sq. ft. of hangar space at Superbay thus has an annual rental cost of $9.94/sq. ft., and that rate is properly applied to the similar hangar space of the collateral.

*(3) Office space.* Under the Superbay lease, American Airlines rents office space at $13.35/sq. ft. That rate is properly applicable to the office space that is part of the collateral.

*(4) Total annual rent.* Applying the annual rental values determined above to the various types of property included in the collateral produces a total annual rental cost of $4,747,497.70, calculated as follows:

| | | |
|---|---|---|
| Paved area: | 668,148 sq. ft. at $1.50/sq. ft. | $1,002,222.00 |
| Hangar space: | 197,322 sq. ft. at $9.94/sq. ft. | $1,961,380.70 |
| Office space: | 76,097 sq. ft. at $13.35/sq. ft. | $1,015,895.00 |
| Storage space: | 153,600 sq. ft. at $5/sq. ft. | $768,000.00 |
| Total annual rent: | | $4,747,497.70 |

*Present value of future rents.* The cost of the collateral is not limited to the rent that it could command in a single year, since HSBC has a right to control the collateral for several future years. Determining the cost of the collateral, then, requires that future rents be reduced to present value. Determining this present value, in turn, requires a determination of (a) the number of future lease years included in the collateral, (b) the extent of any increase in rents due to inflation adjustments, and (c) the appropriate discount rate.

*(a) Length of the collateral lease.* As part of the sublease-leaseback transaction, United granted an interest in the "subleased" property to CSCDA through 2033, even though at the time of the transaction United's own leasehold interest in the property extended only through 2003 (with an option to renew the lease through 2013). United exercised that option before its bankruptcy filing, and so, at the time of that filing, CSCDA had a security interest in the collateral through 2013. The cash flow of the collateral would extend through that year.

After the bankruptcy filing, though, United negotiated a further 10-year option to extend the MOC lease, and HSBC contends that this option should extend the stream of income that its collateral could produce.

HSBC's primary argument in favor of including the postpetition option is that the parties stipulated that this should be done. According to HSBC, the Stipulation recognizes HSBC's security interest in the collateral portion of United's MOC lease as of the date of the Stipulation. However, HSBC does not cite any portion of the Stipulation that it contends has this effect, and there is none. The Stipulation states merely that HSBC has a perfected security interest "in United's leasehold interest" in the property described in the sublease-leaseback. Stip. ¶ 1, Docket Item No. 18. Nothing in the Stipulation addresses the date as of

10

which the extent of that leasehold interest should be determined. HSBC argues that the Stipulation was a compromise, allowing HSBC to claim the postpetition option as part of the leasehold collateral in exchange for giving up claims to other elements of security. But nothing in the Stipulation in any way limits HSBC's claims. The Stipulation merely acknowledges the validity of HSBC's security interest in the property described, leaving HSBC free to assert any other security interest it chose.[3]

As a matter of law, HSBC's collateral does not include the option to extend the MOC lease from 2013 to 2023. HSBC's lien arose before United's bankruptcy was filed in December 2002. (The lien arose in connection with the bond issuance, and the parties have stipulated that is was "granted on August 1, 1997." Stip. ¶ 1.) Because United acquired the option after its bankruptcy filing, any additional collateral value the option provided is subject to § 552(a) of the Bankruptcy Code, which generally prevents prepetition liens from attaching to property interests that a debtor acquires postpetition. Section 552(a) states: "Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a).

Section 552(b), the sole exception to the anti-attachment rule, allows a prepetition lien to reach the proceeds, products, offspring, or profits of prepetition collateral. Even the broadest definition of "proceeds," however, limits its scope to property that arises when collateral is converted from one form into another. *Compare* H.R. Rep. No. 95-595, 95th Cong., 1st

---

[3] To be sure, at earlier stages of this proceeding United assumed that the postpetition option was part of the leasehold. It argued about the scope of the leasehold for the first time in post-trial briefing. However, HSBC has not suggested that it could have introduced evidence bearing on the question had United raised it earlier—indeed, the only relevant facts are the dates and content of the sublease-leaseback transaction and the option extension, none of which is in dispute. *Cf. Ware v. Commissioner*, 906 F.2d 62, 65 (2d Cir. 1990) (holding that a court may consider a theory raised for the first time in a post-trial brief unless it is precluded by the pleadings or it prejudices the opposing party). HSBC was given ample time to respond to United's post-trial brief. The resulting legal question is thus appropriate for determination.

Sess. 377 (1977) (stating that "[t]he term 'proceeds'. . . covers any property into which property subject to the security interest is converted") *with Unsecured Creditors Comm. v. Marepcon Fin. Corp. (In re Bumper Sales, Inc.)*, 907 F.2d 1430, 1437 (4th Cir. 1990) (rejecting the interpretation of the House Report because it "encourages a broader coverage of proceeds than in the UCC."); *see also Great West Life & Annuity Assurance Co.*, 177 B.R. 843, 851 (N.D. Ohio 1994) ("Although broader than the definition in UCC § 9-306(1), the federal approach still maintains 'conversion' as the essential aspect of 'proceeds.'") (footnote omitted).

United's postpetition option to extend the MOC lease is not a "proceed" of the collateral that existed at the time of the bankruptcy filing. The extension option in no way derived from a conversion of the sublease into a different form. Rather, the extension option was a separately acquired property right, obtained through United's postpetition activity—precisely the sort of property right that § 552(a) protects from prepetition security agreements. *Cf. In re Bering Trader, Inc.*, 944 F.2d 500, 502 (9th Cir. 1991) ("Section 552(a) is intended to allow a debtor to gather into the estate as much money as possible to satisfy the claims of all creditors."); *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 405 (Bankr. N.D. Tex. 2003) ("From a plain reading of § 552, revenues generated post-petition solely as a result of the debtor's labor are not subject to a pre-petition lender's security interest.").

Thus, HSBC's collateral is the leasehold interest that United possessed on the petition date, without any extension due to the postpetition option; the cost to United to replace that leasehold must take into consideration the period through 2013, but not later years.

*(b) Adjustment for inflation.* When negotiating leases, SFO's practice is to require annual adjustments for inflation. HSBC Ex. 1 at 30. Generally, the increase is calibrated to the Consumer Price Index ("CPI") for the San Francisco area with a cap at 4%. *Id.* The relevant CPI has averaged 2.96% over the last ten years, whereas the average contract adjustment has

been 2.75%.[4] HSBC Ex. 1, at 32. The average contract adjustment rate at SFO is the best evidence of likely future inflation adjustments. Accordingly, the 2005 rental cost would likely increase for subsequent years by 2.75% annually.

*(c) Discount rate.* In addition to establishing replacement cost as the standard for valuing collateral proposed to be retained by a debtor, § 506(a) also directs that valuation be made "in conjunction with any hearing . . . on a plan" affecting the secured creditor's interest. Thus, the date as of which HSBC's collateral should be valued is the date of United's plan confirmation hearing, January 20, 2006, *In re Markos Gurnee Partnership*, 252 B.R. 712, 717 (Bankr. N.D. Ill. 1997).

To value the collateral as of January 2006, its rental cost in subsequent years must be discounted to present value as of that date. *See Till v. SCS Credit Corp.* 541 U.S. 465, 466 (2004) (noting, in a present value determination mandated for Chapter 13 cram down, that "[a] debtor's promise of future payments is worth less than an immediate lump sum payment because the creditor cannot use the money right away, inflation may cause the dollar's value to decline before the debtor pays, and there is a nonpayment risk.") The appropriate discount rate is one that would make HSBC indifferent to receiving either a lump sum on January 20, 2006 or the stream of payments that the collateral could command through June 30, 2013. The discount rate must take into consideration the risk that a renter of the property would default: the higher the risk of nonpayment, the lower the lump sum HSBC would accept—and therefore the higher the discount rate. *Cf. Price v. Marshall Erdman & Assocs.*, 966 F.2d 320, 327 (7th Cir. 1992) ("A computation of damages that ignores the difference in risk between earnings in a volatile occupation and a judicial award of a lump sum equal to the present value of those earnings is unsound.").

---

[4] The average contract adjustment was lower because the CPI exceeded the 4% cap in the years 1999-2001. In those years, the contract adjustment was 4%, while the CPI was 4.2%, 4.5%, and 5.4%.

The only party that would rent HSBC's collateral at full value is a major airline able to make full use of the large hangar space. The risk that a major airline would default on a lease of such space is comparable to the risk of default on other obligations. Therefore, industry-wide cost of capital is a suitable measure of the risk inherent in the lease of airline infrastructure. Ibbotson Associates, an investment research firm, reports that the cost of capital for major airlines in 2005 was 13.04%, and that rate is properly employed here. United Ex. 33. United argues that a higher discount rate should apply, but the argument is based primarily on risks that would only apply in years after 2013.

The following chart sets out the discounted cash flows that in total reflect the replacement cost of HSBC's collateral, and hence its allowed secured claim under § 506(a).

| Time period | Rent (2.75% inflation) | PV factor (13.04% discount) | Present value |
| --- | --- | --- | --- |
| 1/20/2006 – 1/19/2007 | $4,878,053.89 | 1 | $4,878,053.89 |
| 1/20/2007 – 1/19/2008 | $5,012,200.37 | 0.8846426 | $4,434,005.99 |
| 1/20/2008 – 1/19/2009 | $5,150,035.88 | 0.78259254 | $4,030,379.65 |
| 1/20/2009 – 1/19/2010 | $5,291,661.87 | 0.6923147 | $3,663,495.30 |
| 1/20/2010 – 1/19/2011 | $5,437,182.57 | 0.61245108 | $3,330,008.34 |
| 1/20/2011 – 1/19/2012 | $5,586,705.09 | 0.54180032 | $3,026,878.60 |
| 1/20/2012 – 1/19/2013 | $5,740,339.48 | 0.47929964 | $2,751,342.67 |
| 1/20/2013 – 6/30/2013 | $2,673,216.80 | 0.42400889 | $1,133,467.40 |
| | | Total | $27,247,632.00 |

### Conclusion

For the reasons stated above, judgment will be entered, by separate order, that HSBC has an allowed secured claim of $27,247,632.

Dated: October 5, 2006

Eugene R. Wedoff
United States Bankruptcy Judge